UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

ROSEHOFF LTD. and
SYSTEM PRODUCTS UK LTD.,

                              Plaintiffs,

                                                    **REPORT AND**
                                                    **RECOMMENDATION**
          v.                                        12-CV-1143A

CATACLEAN AMERICAS LLC,
GORDON GANNON, and
GREGORY GANNON,

                              Defendants.

## I.    INTRODUCTION

The Hon. Richard J. Arcara referred this case to this Court under 28 U.S.C.

§ 636(b).  (*See* Dkt. No. 13.)  Pending before the Court are motions to dismiss[1]

plaintiffs' amended complaint under several subsections of Rule 12(b) of the

Federal Rules of Civil Procedure ("FRCP").  (Dkt. Nos. 25, 27.)  Primarily,

defendants seek dismissal because a Licensing Agreement that System Products

UK Ltd. ("System Products") and Cataclean Americas LLC ("Cataclean LLC")

entered in 2008 contains arbitration, venue, and choice of law provisions that

require any dispute resolution to occur in the United Kingdom under British law.

_____

[1] In the alternative, defendants seek to compel arbitration or to stay/abstain
from this case pending the outcome of state litigation.

Defendants also make other arguments for dismissal based on a requirement for arbitration under the Federal Arbitration Act ("FAA"); a failure to state a claim arising from the irrevocable nature of the license in question; and a lack of standing from plaintiffs, who did not sign the Licensing Agreement.

Plaintiffs oppose the motions and urge the Court to let this case continue. Plaintiffs argue that their trademark infringement, patent infringement, and related claims exist independently of the Licensing Agreement and thus can proceed in a United States District Court. According to plaintiffs, defendants have undermined their arguments about venue by filing separate litigation over corporate ownership and fiduciary duties in New York State Supreme Court. Among other responses to defendants' arguments, plaintiffs assert that they have standing because they own the patent and trademark in question and because the alleged infringement of that patent and trademark is ongoing and independent of the Licensing Agreement.

Following a request from the Court (Dkt. No. 31), the parties filed supplemental briefing on May 10, 2013. (Dkt. Nos. 34, 35, 36.) The Court now deems oral argument unnecessary under FRCP 78(b). For the reasons below, the Court respectfully recommends granting the motions and dismissing the amended complaint for a lack of subject matter jurisdiction stemming from an enforceable forum selection clause.

## II.    BACKGROUND

### A.    *The Cataclean Patent and Trademark*

This case concerns allegations that defendants are promoting and selling

plaintiffs' fuel additive without permission, infringing on plaintiffs' patent and

trademark in the process.[2]  The fuel additive in question is an organic solution

that attempts to remove carbon deposits from catalytic converters in cars, thereby

improving the efficiency and prolonging the life of the converters.  Hugh Collins

("Collins") invented the fuel additive and called it "Cataclean."  Collins applied for

a patent for Cataclean with the United States Patent and Trademark Office

("USPTO") on June 7, 2000.  The USPTO issued Patent No. 6,843,813 (the

"Patent") on January 18, 2005.  In the Patent, Collins claims, *inter alia*, "[a]

rejuvenating or cleaning composition for a catalyst of a vehicle catalytic converter

comprising 10–40 wt % isopropyl alcohol, 10–40 wt % acetone, 35–65 wt %

xylene and 5–15 wt % paraffin, and one or more of the elements Sr, Bi, Cd, Ba,

Ni, Mn, Fe, Na, Zn, AI, Ca, Cu, Pb, Co, K, Cr, Mg, As, Sn, Sb, Y, Ti, Be, Si, P, W,

and Mo."  (Dkt. No. 21-1 at 6.)  Collins invented Cataclean because "[a] major

problem with catalytic converters is that the catalyst is easily poisoned and/or

rendered less effective, for example by a build up of carbonaceous deposits, or

by the accumulation of certain elements such as lead or phosphorus on the

_____

[2] For brevity and in recognition of the factual standard under FRCP
12(b)(1), the Court will avoid repeated use of the word "alleged" when
summarizing plaintiffs' factual allegations.

surface of the catalyst." (*Id.* at 3.)  By inventing Cataclean, Collins hoped "to address at least some of the problems of catalyst deactivation by providing an improved composition for cleaning and/or rejuvenating a catalyst of the type found in a catalytic converter without having to remove the catalyst from the vehicle." (*Id.*)  On July 20, 2010, the USPTO issued Trademark No. 3,819,984 (the "Trademark") for the word "Cataclean" in connection with fuel additives for fuel injectors and catalytic converters.  (Dkt. No. 21-2 at 2.)  The Trademark corresponds to Trademark No. 2281660 issued in the United Kingdom on March 1, 2002.

Over the last 10–15 years, Collins made several corporate decisions to help set up promotion of his Cataclean product.  In 1999, Collins and an investor named Ross Baigent ("Baigent") created System Products and became its sole owners.  In 2002, Collins and Baigent created Rosehoff Ltd. ("Rosehoff") as a holding company and are the sole owners of Rosehoff.  Collins and Baigent assigned all of their equity in Systems Products to Rosehoff when they created Rosehoff.  Collins assigned the Patent to Rosehoff on March 28, 2011 and recorded that assignment with the USPTO on July 27, 2011.  Collins assigned the Trademark to Rosehoff on May 17, 2011 and recorded that assignment with the USPTO on June 8, 2011.

**B.** *The Licensing Agreement*

To help promote Cataclean in the Western Hemisphere, Collins and Baigent collaborated with Gordon Gannon ("Gordon"), Gregory Gannon ("Gregory"), and Rory O'Connor ("O'Connor") to create Cataclean LLC, a New York limited liability company, on March 24, 2008. On July 17, 2008, System Products and Cataclean LLC entered the Licensing Agreement. The Licensing Agreement contains several provisions relevant to this case generally. Under Section 2.2, System Products set forth its intent to grant Cataclean LLC a license to use the Patent and Trademark in the Western Hemisphere "only in order to distribute and market [products covered by the Patent and Trademark] supplied by the Licensor on the terms set out in this Agreement." (Dkt. No. 21-3 at 3.) Under Section 3.1, System Products specifically granted Cataclean LLC "an exclusive irrevocable licence to use the [Patent and Trademark] in the [Western Hemisphere] to distribute market and sell and to solicit orders . . . ." (*Id.*) System Products and Cataclean LLC agreed that neither party "may enter into any binding agreement on behalf of the other without express written consent of the other party." (*Id.*) Under Section 9.2, Cataclean LLC agreed that it "may not assign the benefit of this Agreement nor grant any sublicence or otherwise deal with its rights under this Agreement." (*Id.* at 10.) Under Section 9.23, Cataclean LLC agreed "not to derive any rights pertaining to" the Trademark and agreed not to use the Trademark "should this License agreement be withdrawn unless with

5

[System Product's] express written permission." (*Id.* at 12.) Section 13 of the Licensing Agreement contained a severance provision, while Section 14 specified that Cataclean LLC could not act as an agent for System Products. Under Section 18, either party could terminate the Licensing Agreement without notice of termination if either of two events occurred: "if the other party materially breaches any term or provision of this agreement"; or if "compelling grounds are present." (*Id.* at 17.) Section 18.1 defined "compelling grounds" in several ways, including "[d]eliberate or grossly negligent contravention of one or more of the stipulations of the agreement by one of the parties." (*Id.*)

In addition to the provisions generally relevant to plaintiffs' claims, the Licensing Agreement contained two provisions relevant to the pending motions. Section 17 contained an arbitration provision and reads in full as follows:

> Any dispute, controversy, claim or difference arising out of, or in connection with, or resulting from this Agreement, its application or interpretation, or the breach thereof, which cannot be settled amicably by the parties, shall be shall be [sic] referred to a single arbitrator to be agreed upon by the parties or (failing agreement) to be appointed by the then President of the Chartered Institute of Arbitrators of England & Wales, such arbitrator to have all powers conferred on arbitrators by the Arbitration Act 1996 or any statutory modification or re-enactment of it for the time being. The decision of the arbitrator shall be final and binding on the parties, and judgment upon any award rendered may be entered in any court having jurisdiction thereof.

(*Id.* at 16–17.)

Section 19 contained a provision titled "Governing law" and reads in full as follows:

This Agreement shall be governed by the law of England and Wales in every particular including formation and interpretation and shall be deemed to have been made within England and Wales. The parties agree to submit to the exclusive jurisdiction of the courts of England and Wales.

(*Id.* at 19.)

## C. *The Pending Litigation and Motions*

This case and the pending motions followed a deterioration of the relationship between plaintiffs and defendants in 2010 and 2011. During that time, plaintiffs believed that Cataclean LLC was conducting business outside the territorial and other limits defined in the Licensing Agreement, and was failing to make certain payments and minimum purchase obligations under the Licensing Agreement. After Cataclean LLC entered an unauthorized distribution agreement with former defendant Prestolite Wire, LLC ("Prestolite"), plaintiffs sent notice of termination of the License Agreement, dated August 17, 2011. Plaintiffs invoked Sections 4.2.5 and 18.1 of the Licensing Agreement in their notice and claimed violations of numerous other sections. (Dkt. No. 21-7 at 2.) Around this time, in ways that are not clear from the record, plaintiffs also became aware of apparent attempts by Cataclean LLC to assign the Patent and Trademark to itself through fraudulent transfer documents filed with the USPTO on July 29, 2011. (Dkt. Nos. 21-4, 21-5.) Plaintiffs corrected the fraudulent assignment of the Trademark (Dkt. No. 21-6) and are in the process of correcting the fraudulent assignment of the

Patent. Despite the notice of termination of the Licensing Agreement,[3]

defendants continue to sell the Cataclean product and to use the Trademark.

Before this case began, Cataclean LLC filed an action against Collins and

Baigent in New York State Supreme Court, Erie County, on December 1, 2011.

(*See* Dkt. No. 18-1 at 105–18.)  Cataclean LLC claimed proper venue in Erie

County based on its place of business.  In short, Cataclean LLC claims that

Collins and Baigent breached their fiduciary duties to it, as co-owners, by

interfering with the Prestolite distribution agreement after encouraging it; by

pursuing business with other distributors in North America despite the exclusive

nature of Section 3.1 of the Licensing Agreement; and by interfering with the

exclusive and irrevocable license of the Patent and Trademark.  Cataclean LLC

asserts that the claims in the state case are independent of this case and of the

Licensing Agreement; through their supplemental memorandum, plaintiffs counter

that the claims in the state case rest on the assumption that the Licensing

Agreement was not terminated and would make no sense otherwise.

This case began when plaintiffs filed their complaint on November 19,

2012.  In response to an initial motion to dismiss, plaintiffs filed an amended

complaint on March 7, 2013 (Dkt. No. 21).  The amended complaint contains six

_____

[3] Although defendants do not contest August 17, 2011 as the date of
termination of the Licensing Agreement for the limited purposes of FRCP 12(b),
"it is Defendants' actual position that the License Agreement was not terminated
because the Plaintiffs lacked compelling grounds to do so as required under the
License Agreement."  (Dkt. No. 36 at 2.)

claims.  In the first three claims, plaintiffs accuse defendants of trademark infringement, unfair competition, and other violations of the Lanham Act, 15 U.S.C. §§ 1051–1141n.  In the fourth claim, plaintiffs accuse defendants of patent infringement in violation of 35 U.S.C. § 271.  In the fifth and sixth claims, plaintiffs accuse defendants of trademark infringement and unfair competition under New York law.

Defendants filed the pending motions on March 25 and 27, 2013. Principally, defendants refer to Section 19 of the Licensing Agreement and the language selecting the United Kingdom as the exclusive venue and British law as the governing law.  According to defendants, Section 19 combines with the arbitration provision of Section 17 to require the parties to seek resolution of the disputes in this case in the United Kingdom.  As other arguments for dismissal, defendants assert that plaintiffs have failed to state a claim of patent or trademark infringement because of the exclusive and irrevocable nature of Section 3.1 of the Licensing Agreement.  Defendants also argue that plaintiffs lack standing to sue because they did not own the Patent and Trademark when the Licensing Agreement came into being and because Collins, who did own the Patent and Trademark then, was not a party to the Licensing Agreement.  Finally, defendants make arguments about the failure to join Collins, Baigent, and O'Connor as necessary parties and about the need for abstention or a stay pending the outcome of the state case.

Plaintiffs oppose each of defendants' arguments for dismissal. Plaintiffs argue that venue for this case is proper here because, after the notice of termination of the Licensing Agreement and regardless of any rulings related to it, defendants have been committing independent acts of patent and trademark infringement enforceable under federal law. Plaintiffs further point to the equitable unfairness of letting defendants oppose the same geographical venue for this case that they chose for the state case; when presented with the chance in supplemental briefing, however, to invoke or at least to address the principle of judicial estoppel, they did not do so. Plaintiffs oppose arbitration because of what they perceive as an irreconcilable tension between Section 17 of the Licensing Agreement requiring arbitration and the language in Section 19 giving British courts "exclusive jurisdiction." Finally, plaintiffs argue that they have stated cognizable claims for ongoing patent and trademark infringement; oppose joinder of any other parties as unnecessary; and oppose any sort of abstention or stay because of the differences between the state case and this case.

## III. DISCUSSION

### A. *Motions to Dismiss Based on Forum Selection*

Although the parties have raised a number of issues, the issue of forum selection—expressed specifically for arbitration under Section 17 of the Licensing Agreement or generally for any matters under Section 19—stands out as the issue that the Court should resolve first. Defendants chose forum selection as

their primary argument for dismissal.  While the parties dispute whether the

Licensing Agreement was terminated, they do not dispute that the Licensing

Agreement contains forum selection language and that the language would have

been in effect from July 17, 2008 through at least August 17, 2011.  *Cf. Global*

*Seafood Inc. v. Bantry Bay Mussels Ltd.*, 659 F.3d 221, 224 n.2 (2d Cir. 2011)

(noting that "it makes sense to address first the forum selection clause in order to

determine the appropriate venue for hearing the parties' dispute about the scope

and effect of the [contract]").  Addressing forum selection first also promotes

judicial economy in that it avoids a scenario in which one court spends time and

energy analyzing issues only to find out later that another court should have

addressed those issues.

Next, the Court will review the procedure for motions to dismiss based on

forum selection clauses.  Plaintiffs have invoked FRCP 12(b)(1), which covers a

lack of subject matter jurisdiction, and FRCP 12(b)(3), which covers improper

venue.  "The Supreme Court has not specifically designated a single clause of

Rule 12(b) as the proper procedural mechanism to request dismissal of a suit

based upon a valid forum selection clause, nor have we."  *Asoma Corp. v. SK*

*Shipping Co., Ltd.*, 467 F.3d 817, 822 (2d Cir. 2006) (internal quotation marks

and citations omitted).  "We have affirmed judgments that enforced forum

selection clauses by dismissing cases for lack of subject matter jurisdiction under

Rule 12(b)(1), for improper venue under Rule 12(b)(3), and for failure to state a

claim under Rule 12(b)(6)." *TradeComet.com LLC v. Google, Inc.*, 647 F.3d 472, 475 (2d Cir. 2011) (citations omitted). Here, defendants have framed their arguments in language suggesting that this Court lacks the authority to adjudicate any of plaintiffs' claims. Defendants have asserted that the Court lacks subject matter jurisdiction over the entire lawsuit because of the forum selection clause. Defendants also have framed their arbitration argument in terms suggesting that the Court cannot resolve any aspect of this case, and courts sometimes resolve motions to compel arbitration under FRCP 12(b)(1). *See, e.g., Sleepy's LLC v. Escalate, Inc.*, No. 10 Civ. 1626(SAS), 2010 WL 2505678, at *1 n.15 (S.D.N.Y. June 18, 2010) (choosing FRCP 12(b)(1) but noting a "lack of clarity in the case law of this Circuit (and others) as to what procedural mechanism must be employed by courts to dismiss actions in which the parties are bound to resolve (or attempt resolution of) their claims in accordance with a contractual grievance procedure, such as an agreement to arbitrate") (internal quotation marks and citations omitted). In opposing the pending motions, plaintiffs have led with arguments that they have patent and trademark infringement claims arising under federal law that are independent of the Licensing Agreement. These arguments hint at a concern about subject matter jurisdiction. Since neither party has addressed the exact procedural mechanism to be used but both parties have addressed subject matter jurisdiction, the Court will proceed using the standard for FRCP 12(b)(1). *Cf. New Moon Shipping Co., Ltd. v. MAN B & W Diesel AG*,

121 F.3d 24, 29 (2d Cir. 1997) ("[T]he burden on the plaintiff, who brought suit in a forum other than the one designated by the forum selection clause, [is] to make a 'strong showing' in order to overcome the presumption of enforceability. This burden we think is analogous to that imposed on a plaintiff to prove that the federal court has subject matter jurisdiction over his suit or personal jurisdiction over the defendant.").

The standard under FRCP 12(b)(1) is straightforward. "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. U.S.*, 201 F.3d 110, 113 (2d Cir. 2000) (citation omitted). "[W]e must accept as true all material factual allegations in the complaint, but we are not to draw inferences from the complaint favorable to plaintiffs. We may consider affidavits and other materials beyond the pleadings to resolve the jurisdictional issue, but we may not rely on conclusory or hearsay statements contained in the affidavits." *J.S. ex rel. N.S. v. Attica Cent. Sch.*, 386 F.3d 107, 110 (2d Cir. 2004) (citations omitted). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Makarova*, 201 F.3d at 113 (citation omitted).

### B. *Choice of Law to Interpret Forum Selection Clauses*

Before addressing the substance of the forum selection issue, however, the Court has one more procedural issue to address. "Here, where the parties have

agreed that the validity, construction and effect of the [Licensing Agreement] is to be governed by English law, we confront a different legal issue. In analyzing a forum selection clause, what effect should we give to a choice of law provision contained in the same contract?" *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 384 (2d Cir. 2007). Section 19 of the Licensing Agreement contains language that British law will govern "every particular" of the agreement, "including formation and interpretation." This language, on its face, would appear to mean that the Court has to use procedural British law even to assess whether the parties' dispute should go to a British court for determination under substantive British law. *Cf. Phillips*, 494 F.3d at 386 ("Without the benefit of briefing by the parties on this issue, we cannot understand why the interpretation of a forum selection clause should be singled out for application of any law other than that chosen to govern the interpretation of the contract as a whole.") (citation omitted). Nonetheless, the parties have not cited any provision of British law at any time in the history of this case. In its request for supplemental briefing, the Court indirectly gave the parties one more opportunity to cite British law when addressing whether a British court could have jurisdiction to enforce violations of federal trademark and patent law by agreement of the parties. The supplemental briefing again contains only citations to U.S. federal law. Since the parties appear not to object to using federal law for the limited purpose of assessing the enforceability of the forum selection clause, the Court's substantive analysis

below will proceed in that way. *Cf. id.* ("We will assume from the parties' briefing that they do not rely on any distinctive features of English law and apply general contract law principles and federal precedent to discern the meaning and scope of the forum clause.") (citations omitted); *Prod. Res. Grp., L.L.C. v. Martin Prof'l, A/S*, No. 08–CV–6333 (KMK), 2012 WL 5426459, at *6 (S.D.N.Y. Sept. 27, 2012) ("In this case, no Party cites to or references any decision or principle of English or Welsh contract law. In fact, the Parties rely heavily on federal law. The only reference to English or Welsh law in the motion papers is a citation to a single opinion for the proposition that English courts may accept jurisdiction over questions of United States patent law pursuant to a forum selection clause . . . . Therefore, it is appropriate to assume that the Parties do not rely on any distinctive feature of English or Welsh law, and acquiesce to application of federal common law.") (citations omitted); *Juergensen Def. Corp. v. Carleton Techs., Inc.*, No. 08–CV–959A, 2010 WL 2671339, at *11 n.5 (W.D.N.Y. June 21, 2010) (Arcara, *J.*) ("Notwithstanding the Florida choice of law and choice of forum clause in Section 17 of the [contract], the parties have litigated this case since December 2008 without ever arguing that this Court lacked jurisdiction or that New York law should not apply. At no time in the lengthy briefing for the pending motion did the parties cite to Florida law.") (citation omitted).

## C.    *Interpretation of Forum Selection and Choice of Law Clauses*

The Court now turns to the substance of the forum selection clause and whether it deprives the Court of jurisdiction.  "[S]uch clauses are prima facie valid and should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances."  *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10 (1972) (citations omitted); *see also id.* at 12–13 ("There are compelling reasons why a freely negotiated private international agreement, unaffected by fraud, undue influence, or overweening bargaining power, such as that involved here, should be given full effect.").  "Determining whether to dismiss a claim based on a forum selection clause involves a four-part analysis.  The first inquiry is whether the clause was reasonably communicated to the party resisting enforcement.  The second step requires us to classify the clause as mandatory or permissive, i.e., to decide whether the parties are required to bring any dispute to the designated forum or simply permitted to do so.  Part three asks whether the claims and parties involved in the suit are subject to the forum selection clause.  If the forum clause was communicated to the resisting party, has mandatory force and covers the claims and parties involved in the dispute, it is presumptively enforceable.  The fourth, and final, step is to ascertain whether the resisting party has rebutted the presumption of enforceability by making a sufficiently strong showing that enforcement would be unreasonable or unjust, or that the clause

was invalid for such reasons as fraud or overreaching." *Phillips*, 494 F.3d at 383–84 (internal quotation marks and citations omitted).

### 1. *Notice of Forum Selection*

The Court does not need to spend a lot of time on the first step of the *Phillips* test. The forum selection clause in question in this case consists primarily of Section 19 of the Licensing Agreement, with an implied choice of forum in the arbitration provisions of Section 17 of the Licensing Agreement. The information available in the record indicates that the corporate and individual parties here have some level of business sophistication and negotiated the forum selection language freely. Plaintiffs have not argued or suggested that defendants attempted to sneak the language into the Licensing Agreement and appear to have acquiesced in the authenticity of the Licensing Agreement attached to the amended complaint. Plaintiffs thus were sufficiently on notice of the forum selection clause.

### 2. *Mandatory or Permissive Nature of Forum Selection Clause*

The second step of the *Phillips* test does not require a lot of time, either. In their opposition papers, plaintiffs skipped the first and second steps of the *Phillips* test to emphasize scope of enforcement and unjust enforcement under the third and fourth steps. Even if plaintiffs had made arguments to the effect that the forum selection clause here was only permissive, that argument would not prevail. "A so-called permissive forum clause only confers jurisdiction in the

designated forum, but does not deny plaintiff his choice of forum, if jurisdiction there is otherwise appropriate.  Alternatively, contracting parties may intend to agree in advance on a forum where any and all of their disputes must be brought to eliminate surprise of having to litigate in a hostile forum.  A mandatory forum clause is entitled to the *Bremen* presumption of enforceability."  *Phillips*, 494 F.3d at 386 (citations omitted).  "A forum selection clause is viewed as mandatory when it confers exclusive jurisdiction on the designated forum or incorporates obligatory venue language."  *Id.*  Here, Section 19 of the Licensing Agreement states explicitly that the parties "agree to submit to the exclusive jurisdiction of the courts of England and Wales."  Plaintiffs argue that Section 17 creates confusion as to whether arbitration takes priority over the submission to British courts, but the mandatory nature of arbitration here is a different issue than the exclusivity of the British forum for litigation.  This case constitutes litigation; if there is to be any litigation between the parties concerning the Licensing Agreement then the plain language of Section 19 designates one and only one exclusive jurisdiction.  The use of the phrase "exclusive jurisdiction" distinguishes this case from other cases in which the use of words like "govern" or "shall" only permitted litigation to occur in a forum.  *Compare, e.g., Phillips*, 494 F.3d at 386 ("The parties' use of the phrase 'are to be brought' establishes England as an obligatory venue for proceedings within the scope of the clause.") *and Prod. Res.*, 2012 WL 5426459, at *7 ("Breaking it down, the License Agreement explicitly provides that it is to be

18

'governed by and construed and interpreted in accordance with the laws of England and Wales and the Parties hereby submit to the *exclusive jurisdiction* of the Courts of England and Wales.' This is precisely the type of language that courts have routinely relied upon to find forum selection clauses to be mandatory.") (citations omitted) *with Global Seafood*, 659 F.3d at 226 ("We do not, however, share the district court's view that the term 'govern'—standing alone—imparts a clear and unambiguous intent by the parties to confer exclusive jurisdiction on Irish Courts or to select Ireland as the obligatory venue."). The Court thus finds that the forum selection clause here is mandatory.

### 3. *Does the Forum Selection Clause Cover This Case?*

The third step in the *Phillips* test is the most hotly contested step in this case. As noted previously, plaintiffs spend considerable time and energy arguing that they terminated the Licensing Agreement on August 17, 2011, that defendants have continued to use the Patent and Trademark without permission, and that they have independent, post-contract infringement claims as a result. The analysis of the third step thus hinges on just how independent plaintiffs' infringement claims could be. "[W]hen ascertaining the applicability of a contractual provision to particular claims, we examine the substance of those claims, shorn of their labels. This approach is consistent with the focus on factual allegations rather than on the causes of action asserted when deciding whether

an arbitration clause applies to particular claims." *Phillips*, 494 F.3d at 388–89 (citations omitted).

A procedural clarification and a look at the language of the Licensing Agreement provides a resolution to the third step. Regarding the clarification, the parties appear to be under the impression that they must accept, for purposes of FRCP 12(b), that the Licensing Agreement was terminated. As the Court noted above, however, in its general discussion of the FRCP 12(b)(1) standard, it must accept all *factual* allegations in the complaint while avoiding inferences. The notice of termination letter that plaintiffs sent defendants on August 17, 2011 is evidence of the factual allegation that notice was sent. Actual termination of the Licensing Agreement is a *legal* conclusion or inference that would flow from the notice given and would presuppose that plaintiffs properly followed Section 18.1. To the extent that the legal termination of the Licensing Agreement is in dispute, the separation of pre-termination infringement and post-termination infringement is not as easy as plaintiffs suggest.

Even if the Court can consider plaintiffs to have terminated the Licensing Agreement, however, the language of Sections 17 and 19 still works against them. Section 17, governing arbitration, requires arbitration for any "dispute, controversy, claim or difference arising out of, or in connection with, or resulting from this agreement, its application or interpretation, or the breach thereof, which cannot be settled amicably by the parties." Section 19 sets up exclusive

jurisdiction in British courts under British law for "every particular" of the Licensing Agreement, "including formation and interpretation."  Together, these clauses cover both the narrow category of forum selection terms including phrases like "arise out of" and the broader category of terms including phrases like "in connection with."  "To 'arise' out of means 'to originate from a specified source.' The phrase 'arising out of' is usually interpreted as 'indicating a causal connection' . . . . The term 'related to' is typically defined more broadly and is not necessarily tied to the concept of a causal connection.  Webster's Dictionary defines 'related' simply as 'connected by reason of an established or discoverable relation.'  The word 'relation,' in turn, as 'used especially in the phrase 'in relation to,' is defined as a 'connection' to or a 'reference' to.  Courts have similarly described the term 'relating to' as equivalent to the phrases 'in connection with' and 'associated with,' . . . and have held such phrases to be broader in scope than the term 'arising out of.'  *Coregis Ins. Co. v. Am. Health Found., Inc.*, 241 F.3d 123, 128–29 (2d Cir. 2001) (editorial marks and citations omitted).  No matter what kind of post-termination chronology plaintiffs try to establish, they cannot dispute that they allowed defendants to use the Patent and Trademark at least as of 2008, that they *dispute* whether defendants can keep using the Patent and Trademark, and that the dispute has something to do with—that is, has a *connection with*—the current state of the parties' rights under the Licensing Agreement.  The possibility that defendants would invoke the Licensing

Agreement as a defense to plaintiffs' infringement claims only would strengthen the connection to the Licensing Agreement and the language requiring arbitration or other resolution in a British forum. *Cf. Prod. Res.*, 2012 WL 5426459, at *11 ("As noted, Defendant might invoke the Agreements as a defense to Plaintiff's patent infringement allegations, thereby making the 'dispute' one that is 'related to the' Agreements and, therefore, to be decided 'in accordance with' the forum selection clause (via the dispute resolution clause) in each Agreement.") (citations omitted). The Court thus concludes that the forum selection clause in this case governs the claims in the amended complaint.

### 4. *Rebutting the Presumption of Enforceability*

The Court's conclusions about the first three steps of the *Phillips* test make the forum selection clause in question presumptively enforceable. The last step of the *Phillips* test concerns whether plaintiffs have rebutted that presumption. "[A] forum clause is enforceable unless (1) its incorporation was the result of fraud or overreaching; (2) the law to be applied in the selected forum is fundamentally unfair; (3) enforcement contravenes a strong public policy of the forum state; or (4) trial in the selected forum will be so difficult and inconvenient that the plaintiff effectively will be deprived of his day in court." *Phillips*, 494 F.3d at 392 (citation omitted).

Here, plaintiffs have not satisfied any of the criteria for rebutting the presumption of enforceability. The parties appear to have some level of business

sophistication and to have negotiated the Licensing Agreement and its forum selection clause freely. In fact, since Collins and Baigent are plaintiffs' sole owners and 40% owners of Cataclean LLC, any allegation of fraud faces the additional hurdle of explaining why Collins and Baigent would defraud or pressure themselves. The ownership interests of Collins and Baigent on both sides of this case also diminishes any argument about the unfairness of proceeding in British courts. In this case, British courts would not provide quite the neutral forum discussed in other cases. *See Bremen*, 407 U.S. at 11–12 ("Not surprisingly, foreign businessmen prefer, as do we, to have disputes resolved in their own courts, but if that choice is not available, then in a neutral forum with expertise in the subject matter."); *Prod. Res.*, 2012 WL 5426459, at *12 ("[T]he Parties selected England and Wales as the neutral jurisdiction."). Still, the nature of the ownership interests here does not quite set up the fear of a "home field advantage" that litigants sometimes have. As for other aspects of British law or public policy, the parties have not cited any British authorities that would address the topic, though British courts do seem capable of enforcing U.S. patent and trademark claims when necessary. *Cf. Prod. Res.*, 2012 WL 5426459, at *12 ("Yet, Plaintiff has provided no legal authority, from any court in the United States, England, or Wales, for its assertion that English or Welsh courts would refuse to honor the provision in the Agreements that American law would govern the scope of the patents in suit. Indeed, the Federal Circuit has enforced a forum selection

clause that permitted an Italian court to interpret a United States patent. And, the Court is aware of some authority suggesting that the courts of England are willing to apply United States patent law.") (citing *Celltech Chiroscience Ltd. v. MedImmune Inc.*, [2004] F.S.R. 3, 39 (2003-07-17) ("It is not disputed that the issue is to be determined in accordance with the patent law of the United States . . . .") (citation omitted)).  Additionally, as noted above, plaintiffs have declined the Court's explicit invitation to invoke the doctrine of judicial estoppel regarding the ongoing state case.  The Court thus sees no reason to address plaintiffs' arguments about the "fairness" of defendants' decision to maintain the state case and the pending motions here simultaneously.  Finally, the parties have made no argument that arbitration or litigation in the United Kingdom is more burdensome than conducting transatlantic business or somehow became more burdensome after the parties freely contemplated a British forum in 2008.  Plaintiffs thus have not rebutted the presumption that the forum selection clause that they chose is enforceable.

### D.  *Remaining Arguments*

As noted above, the parties have made other arguments pertaining to compelling arbitration; the sufficiency of the claims in the complaint; standing; joinder; and abstention or a litigation stay.  Assessing these other arguments would be unnecessary and contrary to judicial economy if Judge Arcara agrees that the forum selection clause, as set forth in Sections 17 and 19 of the

Licensing Agreement, is enforceable and deprives the Court of subject matter jurisdiction.[4]  Therefore, this Court respectfully recommends rejecting those arguments as moot but will revisit them at Judge Arcara's request.

## IV.    CONCLUSION

For all of the foregoing reasons, this Court respectfully recommends granting the pending motions to dismiss (Dkt. Nos. 25, 27) for lack of subject matter jurisdiction due to the presence of an enforceable forum selection clause.

## V.    OBJECTIONS

A copy of this Report and Recommendation will be sent to counsel for the parties by electronic filing on the date below.  Any objections to this Report and Recommendation must be electronically filed with the Clerk of the Court within 14 days.  *See* 28 U.S.C. § 636(b)(1); FRCP 72.  "As a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point."  *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (citations omitted).

---

[4] To the extent that the parties appear before Judge Arcara at some point and discuss defendants' arguments about ownership interests affecting standing, the Court notes here briefly that the chronology of ownership interests is not an issue because, *inter alia*, "a non-signatory to a contract containing a forum selection clause may enforce the forum selection clause against a signatory when the non-signatory is 'closely related' to another signatory."  *Magi XXI, Inc. v. Stato della Città del Vaticano*, ___ F.3d ___, 2013 WL 1799485, at *5 (2d Cir. Apr. 30, 2013) (citation omitted).

SO ORDERED.

_____/s Hugh B. Scott_____
HONORABLE HUGH B. SCOTT
UNITED STATES MAGISTRATE JUDGE

DATED: May 13, 2013